IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| **Miloud Oualia,** ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 1:22cv735 (RDA/WEF) |
| ) | |
| **Esochaghi,** *et al.*, ) | |
| Defendants. ) | |

MEMORANDUM OPINION

Miloud Oualia, ("Oualia" or "Plaintiff"), a Virginia inmate proceeding *pro se*, filed a civil rights action pursuant to 42 U.S.C. § 1983, alleging that Defendants Dr. Esochaghi and Michael Breckon violated his Eighth Amendment rights while he was detained at the Virginia Department of Corrections, ("VDOC"), Lawrenceville Correctional Center. ("LCC").[1] The claim concerns treatment that Plaintiff received for pain in his right nostril that began in July 2020. Defendant Dr. Esochaghi ("Defendant") was served, filed an answer, and filed a motion for summary judgment on December 1, 2023. Defendant's motion for summary asserts that Plaintiff failed to exhaust his administrative remedies before filing his complaint, and also asserts that he was provided proper medical care. Dkt. Nos. 31, 32. Plaintiff has been advised of his right to file responsive materials pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), and Local Rule 7(K), and he was granted extensions of time to respond on January 3, 2024, and again on February 29, 2024, Dkt. Nos. 34, 37. Plaintiff filed his response on July 12, 2024. Dkt. Nos. 43-45. For the reasons that follow, Defendant's motion for summary judgment will be granted.

---

[1] Attempts at service upon Defendant Breckon were unsuccessful. Dkt. Nos. 17, 38. On July 10, 2024, the Court issued a show cause Order to Plaintiff to provide an address for service on Defendant Breckon and Plaintiff failed to respond. Dkt. No. 41. Because service upon Defendant Breckon has not been perfected, he will be dismissed without prejudice. *See* Fed. R. Civ. P. 4(m).

1

## I.     Undisputed Facts

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Defendant, pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56, set forth a statement of material facts that he contends are undisputed. Dkt. No. 32 at 2. Plaintiff has failed to comply with the Local Rules because he failed to identify the specific facts he was disputing and the record evidence upon which he relied to support his dispute. *JDS Uniphase Corp. v. Jennings*, 473 F. Supp. 2d 705, 707 (E.D. Va. 2007) (deeming movant's statement of undisputed facts admitted because nonmovant's response failed to "identify with any specificity which facts, if any, were disputed") (citing E.D. Va. Loc. Civ. R. 56(B)). Although Plaintiff has provided some documents, which the Court considers as part of the summary judgment record, the majority of disputes he raises are unsupported by reference to any record evidence, affidavits, or declarations and his response is not sworn.[2] *See* Dkt. No. 43. Based upon the Court's review of the record, the undisputed statement of facts are as follows:

---

[2] The record of admissible evidence for summary judgment includes Defendant's affidavits and exhibits. Dkt. Nos. 32-1 through 32-5. Plaintiff's response to the motion for summary judgment is not sworn, Dkt. No. 43, and the several documents he has attached are not authenticated and concern an alleged hunger strike. Dkt. Nos. 43-2; 42-3; 44; 45. To the extent Plaintiff seeks to amend his complaint by raising new matters in a response to a motion, he may not do so via a brief. *See Hurst v. District of Columbia*, 681 F. App'x 186, 194 (4th Cir. 2017) (explaining that "a plaintiff may not amend his complaint via briefing") (citing *Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988)). "While the courts liberally construe *pro se* pleadings as a matter of course, judges are not also required to construct a party's legal arguments for him" or "divine" what the plaintiff is trying to achieve or say. *Small v. Endicott*, 998 F.2d 411, 417-18 (7th Cir. 1993) (citation omitted)). However, since there has been no objection to the inclusion of Plaintiff's submitted medical records, Dkt. Nos. 44; 45, or Plaintiff's attached Emergency Grievance, Dkt. 43-1, in the summary judgment record and Defendant has had an opportunity to review them and file his reply, Dkt. No. 50, the Court will include citations to these documents when they are relevant—which also renders Plaintiff's motion to have the records considered, Dkt. No. 42, moot, even though they were filed a few days after Plaintiff's deadline to respond.

1.      Plaintiff is an inmate in the custody of the VDOC and was housed at its LCC facility during the relevant time frame in 2020. Dkt. No. 32-1 at 1-2.

2.      Defendant Dr. Esochaghi was a doctor at LCC in July 2020, and he saw and treated Plaintiff for his complaint involving his nose. Dkt. No. 32-5 ¶¶ 1, 14-20.

*Medical Treatment*

3.      Dr. Esochaghi saw Plaintiff on July 9, 2020 for an unrelated matter. During that visit, Plaintiff's medical records indicate that he told staff that he "refuse[d] all medical care." *Id.* ¶ 11; Dkt. No. 32-3 at 14.

4.       Dr. Escochaghi also saw Plaintiff the next day, on July 10, 2020, because Plaintiff had new complaints about his nose; specifically, he complained of "right facial pain and swelling for two days with chills and pain." *Id.* ¶¶ 10, 12; Dkt. No. 32-3 at 14.[3] During the July 10, 2020 medical visit:

> Oualia denied he had a fever, shortness of breath, rashes, body aches, nausea, vomiting, or diarrhea. Oualia was oriented to time, place, and person. He was not in distress. Upon very limited examination Oualia had slight tenderness to the right maxillary region without distension (swelling). Oualia refused any further examination. He only allowed his facial temperature to be measured.

Dkt. No. 32-5 ¶ 12.

4.      A nurse saw Plaintiff at 8:00 p.m. that day and he complained that his nose was swollen and hurt, and that he could not sleep. Dkt. No. 44 at 7. Plaintiff would not allow the nurse to conduct a "full screening," and she provided him with Tylenol for pain. *Id.* The nurse was able

---

[3] Dr. Esochaghi saw Plaintiff on July 9, 2020 because Plaintiff had been on a hunger strike for several days. Plaintiff did not complain about his nose or face at that time. *Id.* ¶¶ 8, 9. Plaintiff "refused to allow" Dr. Esochaghi "to conduct a physical examination" of him on July 9, 2020. *Id.* ¶ 9; Dkt. No. 32-3 at 8, 11.

3

to determine that, while his nose was tender, Plaintiff was "not in distress," and he was told to contact medical if his condition "worsen[ed]." *Id.* at 8.

5. Dr. Esochaghi next saw Plaintiff on July 13, 2020 at 4:40 p.m. At that time, Plaintiff reported a cough and swelling of the nose, which he claimed he had had for a week. Plaintiff stated that the swelling was getting worse, was painful, and was interrupting his sleep. Plaintiff indicated that he coughed up blood the previous day and complained of muscle pain, sore throat, loss of smell, and headaches. All of his complaints, other than facial pain, swelling and chills, were new complaints. Plaintiff also stated he had not been drinking water for two days. *Id.* ¶ 14.

6. Dr. Esochaghi examined Plaintiff and found he was in severe pain, but that he was alert and oriented. Dr. Esochaghi's examination noted Plaintiff "had newly observed distension (swelling) of the nose, erythematous (irritated) and very tender to the touch." *Id.* ¶ 15. Plaintiff's right maxillary was also tender.[4] *Id.* Dr. Esochaghi diagnosed Plaintiff as having "a right nasal infection and orbital cellulitis." *Id.*[5]

7. Dr. Esochaghi prescribed Toradol and Mobic for pain, amoxicillin for infection,

---

[4] "Erythematous" is a term that denotes a patient is "exhibiting abnormal redness of the skin or mucous membranes due to the accumulation of blood in dilated capillaries (as in inflammation)." Meriam Webster Dictionary, https://www.merriam-webster.com/dictionary/erythematous (last viewed Aug. 20, 2024).

[5] "Orbital cellulitis is a bacterial infection that can cause serious complications in your eye, including blindness." https://my.clevelandclinic.org (search "orbital-cellulitis") (last viewed Aug. 20, 2024). In more than 90% of orbital cellulitis cases, patients usually "have a sinus infection that spreads to the tissue around their eye." *Id.* CT Maxillofacial imaging is a diagnostic tool used to assess various conditions affecting the head, neck, and facial areas. "CT (Computed Tomography) Maxillofacial imaging involves the utilization of specialized X-ray equipment to generate detailed cross-sectional images of the bones, soft tissues, and blood vessels within the head and neck region. This non-invasive procedure allows for a comprehensive examination, offering a three-dimensional view of the affected area with exceptional clarity." https://radiologyinplainenglish.com/ct-maxillofacial/ (last viewed Aug. 20, 2024).

increased Plaintiff's Tylenol dosage, and counseled Plaintiff, who was still on a hunger strike, that he needed to eat food. "Labs were pending" and Dr. Esochaghi recommended a COVID test once his infection subsided. *Id.* at ¶ 16. Dr. Esochaghi also recommended "a maxillary facial CT [scan] if symptoms did not resolve." *Id.*; Dkt. No. 32-3 at 17-18.

8. Less than 24 hours later, Dr. Esochaghi followed up with Plaintiff on July 14, 2020 at approximately 10:45 a.m. and obtained a specimen for COVID testing. Plaintiff reported that he had not eaten anything the day prior and was still complaining of severe pain. Dr. Esochaghi noted nasal swelling but that the irritation was "substantially reduced." Dkt. No. 32-5 at ¶ 18. Dr. Esochaghi recommended that Plaintiff continue the antibiotic regimen and resume eating. *Id.*[6] Later that day, Dr. Esochaghi received Plaintiff's test results, which "showed an elevated white blood cell count, as expected, due to infection." *Id.* ¶ 19; Dkt. No. 44 at 13.

9. The next day, July 15, 2020, at approximately 4:30 a.m., because Plaintiff's symptoms were not improving, "he was transferred to the hospital, where he was treated for a nasal abscess and cellulitis." Dkt. No. 32-5 ¶ 20; Dkt. No. 32-3 at 23.

10. Dr. Esochaghi had not been able to fully examine Plaintiff prior to the July 13, 2020 examination "because plaintiff had refused to allow treatment or examination." Dkt. No. 32-5 at ¶ 22. The first time that Plaintiff permitted examination, on July 13, 2020, was approximately 36 hours before Plaintiff was transferred to the hospital. *Id.* Although, in the July 10, 2020 visit, Dr. Esochaghi had noted some "slight tenderness to the maxillary region without swelling," Plaintiff did not give Dr. Esochaghi the "opportunity to observe any serious medical issue" prior

---

[6] Dr. Esochaghi opined that Plaintiff's "hunger strike, and particularly his refusal to drink water in the days prior to his hospitalization, caused or dramatically exacerbated his condition." *Id.* ¶ 27. In addition, there is no indication in Plaintiff's medical records that he did not fully recover from his infection. *Id.* ¶ 21.

5

to the July 13, 2020 visit because of Plaintiff's refusal to submit to an exam. *Id.*

11.     At VCU Health, Plaintiff complained that his "nose hurts really bad, I don't feel good." Dkt. No. 45 at 4. A CAT scan of his nose showed "extensive soft tissue swelling with no drainable collection," and the impression of the radiologist was "possible cellulitis." *Id.* at 106, 143. The Emergency Room physician was able to "drain a small amount of purulent fluid from the right side of his nose," and Plaintiff was admitted "for cellulitis and [a] possible nasal abscess." *Id.* at 106. A note in his record indicates that his condition was "[n]ot life threatening." *Id.* at 152. Plaintiff was admitted for surgery "for cellulitis and possible nasal abscess." *Id.* at 106.[7]

12.     Plaintiff underwent surgery for an abscess at approximately 12:36 p.m. on July 16, 2020. *Id.* at 77, 83. Later that same day, a doctor entered notes in Plaintiff's chart that stated Plaintiff "seems to have responded well to antibiotics" and he "may return back to the facility. . . [,] [and] from a surgical standpoint[,]" Plaintiff could be "discharged on Keflex or Bactrim" with a follow-up appointment with an Ear, Throat, and Nose specialist in one week. *Id.* at 114. Plaintiff was discharged on July 18, 2020. *Id.* at 116.

*Exhaustion*

13.     The VDOC's Offender Grievance Procedure serves as a mechanism for inmates to potentially resolve problems. Dkt. No. 32-2 at 4.[8]

---

[7] The surgery lasted approximately 45 minutes, and the surgeon removed "some necrotic material" that came from nose cartilage. *Id.* at 131, 133. The procedure was described as "Incision and Drainage Nasal Abscess." *Id.* at 94. Plaintiff was given pain medication, including morphine, when he was in the Emergency Room and throughout his stay in the hospital, and Plaintiff was also given other medications to treat his infection. Plaintiff was discharged on July 18, 2020, and prescribed acetaminophen and Bactrim. *Id.* at 308.

[8] The entire Grievance Procedure is attached as an exhibit to Defendant's brief. Dkt. No. 32-2. Plaintiff alleged in his amended complaint that he filed a "grievance on 7/14/2020 @ 7:00 a.m.," which resulted in a response indicating that his 'grievance d[id] not meet the definition of an emergency." Dkt. No. 15 at 3. Plaintiff's "Attachment #2" in his Answer to Motion for Summary Judgment, is a copy of an "Emergency Grievance," submitted on "7/14/2020 7:00 a.m.,"

6

14. Pursuant to the VDOC grievance procedure, an inmate has thirty calendar days from the date of the alleged incident to file a Regular Grievance ("grievance"). Prior to filing a grievance, the inmate must file an informal complaint to show that he has attempted to informally resolve his complaint. If the inmate is dissatisfied with the response to the informal complaint, he may submit a grievance and attach the informal complaint to document he has attempted to resolve the issue informally. *Id.* at 4-5. If there is no response to the informal complaint "within 15 days, the inmate may file a Regular Grievance." *Id.* at 4.

15. An offender must exhaust all the requirements of the Offender Grievance Procedure before the offender can seek judicial relief. *Id.* at 13.

16. The exhaustion requirement is met only when a Regular Grievance has been accepted into the grievance process and appealed without satisfactory resolution of the issue. *Id.*

17. "The emergency grievance process is for offender reporting and expedited staff responses to situations or conditions that may subject the offender to an immediate risk of serious personal injury or irreparable harm." *Id.* at 14.

18. "If an emergency exists, the designated staff respondent must take necessary and timely action to protect the offender and resolve the emergency. The offender must receive a response to an Emergency Grievance within eight hours of receipt, or less, to protect the offender from serious personal injury or irreparable harm." *Id.*

19. "If there is no emergency, the designated staff respondent should indicate that on the form and return the Emergency Grievance to the offender." *Id.* at 15.

---

and with a response indicating that his "grievance d[id] not meet the definition of an emergency." Dkt. Nos. 43, 43-1 at 2. Plaintiff also states in his Answer to Motion for Summary Judgment that the Emergency Grievance form establishes that he "exhausted all use of the grievance procedure at [his] facility before filing civil suit." Dkt. No. 43, at 1, ¶ 3. Consequently, only the relevant portions of the Grievance Procedure are included in the Undisputed Statement of Facts.

20. Emergency grievances that are not resolved to the inmate's satisfaction may then be filed as a Regular Grievance. OP 866.1(V) provides that:

> A. An offender must exhaust all the requirements of the Offender Grievance Procedure before the offender can seek judicial relief.
>
> B. The exhaustion requirement is met only when a Regular Grievance has been accepted into the grievance process and appealed without satisfactory resolution of the issue.
>
> C. Once the inmate has met the exhaustion requirement, the appeal respondent must notify the inmate that all requirements have been exhausted.

*Id.* at 13. The Emergency Grievance Response is one of the documents that must be filed with a Regular Grievance. *Id.* at 8.

*Plaintiff's Grievance Activity*

21. Plaintiff filed an Emergency Grievance on July 14, 2020, at 7:00 a.m., claiming that the medication he received for his pain was not working, that his face was "swollen," and that he was in "extreme pain." Dkt. No. 43-1.

22. Plaintiff's Emergency Grievance was denied that same day because his "grievance d[id] not meet the definition for an emergency," as he had already "been evaluated by the doctor" and needed to "allow the medicine prescribed time in [his] body to see the effectiveness." *Id.*

23. Plaintiff does not assert that he ever filed a Regular Grievance following the denial of his Emergency Grievance. *See* Dkt. Nos. 43; 43-1 (attaching only Emergency Grievance that Plaintiff claims "confirms all use of the grievance procedure at my facility before filing this civil suit").

24. Andrea Felicia Green, the Institutional Grievance Coordinator at LCC avers that a "true, accurate and authentic copy of" Plaintiff's "VACORIS Report cataloging his grievance activities" (the "Grievance Log") appears in the summary judgment record. Dkt. Nos. 32-4 ¶¶ 1,4; 32-1.

25. No Regular Grievance addressing Plaintiff's medical treatment by Dr. Esochaghi appears on the Grievance Log cataloging Plaintiff's grievance activities in 2020. *See* Dkt. No. 32-1. Moreover, Ms. Green avers that

> [Plaintiff] filed no complaint, formal or informal, at all related to the alleged incident within the five months after July 14, 2020, when he was allegedly hospitalized. It necessarily follows that [Plaintiff] did not appeal any grievance, either . . . [Plaintiff] has not submitted a properly filed Regular Grievance regarding the incident . . .

Dkt. No. 32-4 ¶ 7-9.

## II. Standard of Review

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that judgment on the pleadings is appropriate, *i.e.*, that no genuine issues of material fact are present for resolution. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The facts that a moving party bears the burden of proving are those which are material: materiality is dictated by "the substantive law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Once a moving party has met its burden of proof, the non-moving party must produce specific facts to generate a disputed issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court will view the evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *Porter v. U.S. Alumoweld Co.*, 125 F.3d 243, 245 (4th Cir. 1997). Nevertheless, "[o]nly disputes over facts which might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

The non-moving party may not defeat a properly supported summary judgment motion by

simply substituting the "conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). This applies even where the non-moving party is a *pro se* prisoner. *Campbell-El v. Dist. of Columbia*, 874 F. Supp. 403, 406-07 (D.C. 1994); *see also* Local Civil Rule 7(K)(3) (explaining that to defeat a dispositive motion, a *pro se* party "must identify all facts stated by the moving party with which the *pro se* party disagrees and must set forth the *pro se* party's version of the facts by offering affidavits . . . or by filing sworn statements"). Unsupported speculation is not enough to withstand a motion for summary judgment. *See Ash v. United Parcel Serv., Inc.*, 800 F.2d 409, 411-12 (4th Cir. 1986). Similarly, "[t]he mere existence of some alleged factual dispute" cannot defeat a motion for summary judgment; the dispute must be both "material" and "genuine," meaning that it "might affect the outcome of the suit under the governing law." *Hooven-Lewis v. Caldera*, 249 F.3d 259, 265 (4th Cir. 2001) (emphasis omitted).

### III. Exhaustion of Administrative Remedies

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under § 1983 of this title, or any other federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "PLRA's exhaustion requirement is mandatory," *Anderson v. XYZ Corr. Health Servs., Inc.*, 407 F.3d 674, 677 (4th Cir. 2005) (citing *Porter v. Nussle*, 534 U.S. 516, 524 (2002)), and an "untimely or otherwise procedurally defective administrative grievance" does not satisfy the PLRA's exhaustion requirement. *Woodford v. Ngo*, 548 U.S. 81, 83-84 (2006). Exhaustion is required even if the administrative remedies do not meet federal standards, are not "plain, speedy, and effective," and even if the relief sought is not available via the grievance process, such as monetary damages. *Porter*, 534 U.S. at 524. To

10

properly exhaust, thereby giving the agency a full and fair opportunity to adjudicate a plaintiff's claims, the plaintiff must adhere to the agency's deadlines and procedural rules. *Woodford*, 548 U.S. at 89-90.

The PLRA also requires that an inmate must exhaust his administrative remedies "*before* bringing a suit to challenge prison conditions." *Ross v. Blake*, 578 U.S. 632, 635 (2016) (emphasis added) (citing 42 U.S.C. § 1997e(a)); *see also Graham v. Gentry*, 413 F. App'x 660, 662-663 (4th Cir. 2011) (the PLRA requires an inmate "to exhaust any "available" administrative remedies *before* pursuing a § 1983 action in federal court (emphasis added)).[9] The requirement that a prisoner exhaust before filing in court "allow[s] a prison to address complaints about the program it administers before being subjected to suit, reduc[es] litigation to the extent complaints are satisfactorily resolved, and improv[es] litigation that does occur by leading to the preparation of a useful record." *Porter*, 534 U.S. at 519.

*Woodford* held that the PLRA requires "proper exhaustion," meaning that the plaintiff must "us[e] all steps that the agency holds out, and do[] so properly (so that the agency addresses the issues on the merits)." 548 U.S. at 90 (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)). In so holding, the Supreme Court reasoned that "proper exhaustion" enhances "the quality

---

[9] *Ross* held that courts "may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement" and that "[t]he only limit to §1997e(a)'s mandate is the one baked into its text: An inmate need exhaust only such administrative remedies as are 'available.'" 578 U.S. at 648. Although Plaintiff does not rely on the exceptions in *Ross*, the Court finds that the three exceptions in *Ross* do not apply. *Id.* at 643-44. First, the grievance process was available to Plaintiff, and he alleges that he used it by filing an Emergency Grievance on July 14, 2020. Dkt. Nos. 43 at 1; 43-1 at 2. Second, the grievance procedure is straightforward, and as noted, Plaintiff alleges that he has used it. Lastly, there is no evidence that the VDOC personnel prevented Plaintiff from using the grievance procedure by filing a Regular Grievance after his Emergency Grievance was denied. *See Gibson v. Weber*, 431 F.3d 339, 341 (8th Cir. 2005) ("Appellants have presented no evidence that any prison official thwarted an attempt to initiate the procedures or that any official made it impossible for them to file grievances.").

of those prisoner suits that are eventually filed," for, "[w]hen a grievance is filed shortly after the event giving rise to the grievance, witnesses can be identified and questioned while memories are still fresh, and evidence can be gathered and preserved." *Id*. at 95. Thus, "proper exhaustion" requires "compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Id.* at 90-91. These "critical procedural rules" specifically include grievance timing requirements, for, otherwise, "a prisoner wishing to bypass available administrative remedies could simply file a late grievance without providing any reason for failing to file on time," and, following rejection of the grievance as untimely, "proceed directly to federal court." *Id.* at 95. The PLRA was not intended to "create such a toothless scheme." *Id.* The PLRA's exhaustion-prior-to-filing requirement is "mandatory" and the language of the PLRA is "unambiguous." *Ross*, 578 U.S. at 638. "An inmate 'shall'" not bring any action "absent exhaustion of available administrative remedies." *Id.* (quoting *Woodford*, 548 U.S. at 85) (additional citations omitted)).

> Once a defendant presents evidence of a failure to exhaust, the burden of proof shifts to the plaintiff to show, by a preponderance of the evidence, that exhaustion occurred or administrative remedies were unavailable through no fault of the plaintiff. *Lordmaster v. Augusta Corr. Ctr. Pers.*, No. 7:13cv506, 2014 WL 3359389, at *1, n.2 (W.D. Va. July 9, 2014) (citing *Tuckel v. Grover*, 660 F.3d 1249, 1254 (10th Cir. 2011)).

*George v. Lt. Michalek*, No. 3:19cv155, 2022 WL 3580746, *8 (E.D. Va. Aug. 19, 2022), *aff'd*, No. 22-7356, 2023 WL 3144563 (4th Cir. Apr. 28, 2023).

Here, Defendant, by affidavit and documents, has established that Plaintiff never filed a Regular Grievance regarding his treatment by Dr. Esochaghi as required by the VDOC's Offender Grievance Procedure. While Plaintiff alleges in his amended complaint that he filed an Emergency Grievance, Dkt. No. 15 ¶ 13, there is no evidence in the summary judgment record or elsewhere

that he ever filed a Regular Grievance. Indeed, in his unsworn response to the motion for summary judgment, Plaintiff attached a copy of his July 14, 2020 Emergency Grievance as "Attachment #2" and then stated that Attachment #2 "confirm[s] [he] exhausted all use of the grievance procedure at [his] facility before filing this civil suit." Dkt. No. 43 at 1, ¶ 3. Yet, to fully exhaust one's administrative remedy under the VDOC's grievance procedure, Plaintiff had to also submit a Regular Grievance and then further appeal any denial of his Regular Grievance. Dkt. No. 32-2 at 13. *See Crichlow v. Clarke*, No. 4:23cv6, 2023 WL 2873377, at *3 (W.D. Va. Apr. 10, 2023) ("In other words, regardless of how the grievance originates (Emergency Grievance or Regular Grievance], the exhaustion requirement is met only when an inmate submits and then appeals a regular grievance, without satisfactory resolution of the issue."). Defendant has no record of Plaintiff ever moving beyond the alleged submission of the Emergency Grievance and Plaintiff does not even assert, let alone submit record evidence establishing, that he filed a Regular Grievance or appeal.

The relevant facts for summary judgment purposes are as follows: Plaintiff was required by VDOC policy—and in turn, the PLRA—to file a Regular Grievance after his Emergency Grievance was determined not to be an emergency. The record shows (and Plaintiff essentially admits in his response to the motion for summary judgment) that Plaintiff never filed a Regular Grievance after receiving an unsatisfactory response to his Emergency Grievance. Regardless of Plaintiff's preferred remedy, this was a necessary step. *Woodford*, 548 U.S. at 85. Plaintiff did not file a Regular Grievance, and his failure to do so constitutes a failure to properly exhaust available remedies.[10] The motion for summary judgment will therefore be granted.

---

[10] VDOC OP 866.1 required that Plaintiff file a Regular Grievance within thirty days of the date of the incident, which was July 14, 2020. Dkt. No. 32-2 at 4. Plaintiff was discharged on

13

## IV. Conclusion

Accordingly, for the reasons outlined above, Defendant's motion for summary judgment, Dkt. No. 31, will be granted. An appropriate Order and judgment shall be issued alongside this Memorandum Opinion.

Alexandria, Virginia
August 22, 2024

/s/
Rossie D. Alston, Jr.
United States District Judge

---

July 18, 2020, Dkt. No. 45 at 116, and had more than enough time upon his discharge to pursue his administrative remedy.